RIGGS, Respondent, v. ST. FRANCOIS COUNTY RAILWAY COMPANY, Appellant.

St. Louis Court of Appeals, June 5, 1906.

1. **RAILROADS: Street Railways: Double Damage Act: Construction of Statute.** In determining whether the term "railroad corporation" as used in section 1105, Revised Statutes of 1899, applies to a street railway in a given instance, the court must consider the context and purpose of the statute, the character of mischief sought to be prevented by it, and the use to which the railroad is put.

2. ———: ———: ———: **Fencing Track.** A street railway organized under article 3, chapter 12, of the Revised Statutes of 1899, with authority to operate its railroad by "animal, cable, electric or other motive power" to "transport passengers, express and mails" and running the greater portion of its length through an agricultural country, is a "railroad corporation" within the meaning of section 1105, Revised Statutes of 1899, and liable for double damages for animals killed by its failure to fence its track where it runs through inclosed or cultivated fields or uninclosed lands.

3. ———: ———: ———: **Uninclosed Fields.** The fact that the track of such a railroad corporation runs along a public road by permission of the county court, does not relieve it of its obligation to fence at that point.

Appeal from St. Francois Circuit Court.— *Hon. Chas. A. Killian,* Judge.

AFFIRMED.

*Smith & Marbury* for appellant.

(1) The Double Damage statute (Revised Statutes of 1899, section 1105), relating to the liability of railroad corporations for a failure to erect and maintain lawful fences on the sides of its road, does not apply to street railway companies. Sams v. Railway, 174 Mo. 53; Johnson v. Railway, 104 Mo. App. 588; Stocks

v. Transit Co., 106 Mo. App. 129; Godfrey v. Transit Co., 107 Mo. App. 193; Houts v. Transit Co., 108 Mo. App. 686; Railway v. Lohe, 67 L. R. A. 637; 19 Am. and Eng. Ency. Law, p. 941. (2) The privilege which appellant company acquired by the assent of the county court; that its road might be constructed and tracks laid down and operated in the public highways, can never be more than a qualified right or easement to use said highway in common with every citizen. The law does not grant the street railroad the right of eminent domain, nor does the law impose upon the street railroad the duty to fence its road constructed and operated in a public highway. R. S. 1899, sec. 1187; Sams v. Railway, 174 Mo. 80; Transfer Co. v. Bridge Co., 111 Mo. 666. (3) The Double Damage statute, being in derogation of the common law and penal in its character, must be strictly construed; and so as not to enlarge the liability it imposes, nor allow a recovery, unless the party seeking it, brings his case strictly within the terms or conditions authorizing it. Dudley v. Tel. Co., 54 Mo. App. 391; State ex rel. v. Railway, 19 Mo. App. 104. (4) Conceding that appellant's railroad was unfenced at the point where the cow got upon its track and was killed; yet it devolves upon the respondent to show, that at this particular point, the railroad ran "through, along and adjoining inclosed or cultivated fields and uninclosed lands," and failing to do this, he cannot recover. R. S. 1899, section 1105; Growney v. Railway, 102 Mo. App. 442; Carpenter v. Railway, 25 Mo. App. 110; Smith v. Railway, 25 Mo. App. 113; Berry v. Railway, 65 Mo. 172; Harrington v. Railway, 71 Mo. 384; Johnson v. Railway, 80 Mo. 620; Peddicord v. Railway, 85 Mo. 160.

*R. C. Tucker* and *W. L. Hensley* for respondent.

(1) Railroad corporations are required to errect, keep and maintain lawful fences on the sides of its road

at all points except at public crossings and within the limits of cities and towns and a sufficient amount of space about its depots for the transaction of business with the public; and the question whether the appellant was required to fence at the point where plaintiff's cow came upon the track is one for the triers of the case. Vandermarker v. Railway, 51 Mo. App. 166; Taylor v. Railway, 28 Mo. App. 556; Ellis v. Railway, 89 Mo. App. 241; Riley v. Railway, 89 Mo. App. 375; Brandenburg v. Railway, 44 Mo. App. 224; Prather v. Railway, 84 Mo. App. 86. (2) The contention of appellant that it is not liable under section 1105, R. S. 1899, for the reason that its line of road runs parallel with and adjoins the county road is without merit. It has been held by the Supreme Court and the courts of appeal of this State that where the railroad runs parallel with a public highway where plaintiff's animal strayed upon the railroad track, it is not excused from fencing, even though its said right of way laps upon the highway. Emmerson v. Railway Co., 35 Mo. App. 621; Rolinson v. Railway Co., 57 Mo. 694; Morris v. Railway Co., 79 Mo. 367; Razzelle v. Railway, 79 Mo. 349.

STATEMENT.—The St. Francois County Electric Railway Company was incorporated under article 3, chapter 12, R. S. 1899, and authorized to construct, maintain and operate a street railway for the public conveyance of passengers, mail and express, in the county of St. Francois from and through the town of DeLassus to the city of Farmington, and thence to the unincorporated town of Flat River, a place of about five thousand people in said county. On June 11, 1902, the county court of St. Francois county granted the corporation the right (qualified easement) to construct its railway upon that part of the public road between the south boundary line of the city of Farmington to the city of DeLassus,

120 App.—22

a distance of about one and one-half miles. Afterwards the St. Francois County Electric Railway Company, by a general warranty deed, conveyed its road, franchises, etc., to the present defendant company. The cars on defendant's railway are propelled by means of electricity with trolley appliance. It carries passengers and express, United States mail and some freight, as is shown by the evidence and it is the principal means of transportation from the Iron Mountain Railroad at the city of DeLassus to Farmington. The road is constructed and maintained along upon the northern part of the public highway from Farmington to DeLassus. The railroad is unfenced at the point in question. The evidence shows that there are posts standing between the railroad track and that portion of the public road occupied for highway purposes, but no fence thereon. About a quarter of a mile south of the city of Farmington, the plaintiff's milch cow came upon defendant's tracks and was injured and killed by one of its electric cars. This suit is predicated upon section 1105, R. S. 1899, to recover double the value of the cow. The complaint, sufficient in form, alleges in substance that the cow came upon the railroad track at a point where the defendant was required by law to erect and maintain a lawful fence which it had wholly failed and neglected to do.

The trial was had before the circuit judge without a jury. The court found the issues for the plaintiff, assessing his actual damages at $40 and doubling the same under the provisions of the statute. Defendant appeals and contends, first and principally, that it is not a railroad within the meaning of section 1105, supra, and hence is not required, under the provisions of the said statute, to erect and maintain fences along the sides of its railroad tracks; and second, that in the event it is held to be a railroad within the purview of that statute, plaintiff cannot recover inasmuch as it is only required to fence where its road passes "through,

along and adjoining enclosed fields and uninclosed lands."

The points will be noticed in their order.

NORTONI, J. (after stating the facts.)—1. The first proposition advanced for reversal of the judgment is that appellant is not a railroad corporation within the contemplation of section 1105, R. S. 1899, and as such, required to fence its right of way for the better security and protection of animals on the highway and at large, through the country traversed by it. The case of Sams v. Railway, 174 Mo. 53, is cited and relied upon to sustain this contention, and it is argued that the Supreme Court in that case ruled to the effect that the general statutes of the State employing the term "railroad" has application only to commercial railroads and steam railroads and that street railroads are to be excluded from the provisions of all general statutes employing the term "railroad" only; that to bring a company organized as a street railroad within the purview of the statutes as in this case, it should, by specific terms, mention street railroads, etc. The majority of the members of this court do not so understand that adjudication. We are of the opinion that its true import is well digested and stated in the fifth point of the syllabus, in the following language: "The word 'railroad' used in the staute may or may not apply to a street railway, and to determine whether or not it does, the connection in which it is used must be looked to." And it appears in the opinion that the court had in mind a special statute and was dealing with it "as an act of class legislation," the "fellow servant law of 1897," and held that inasmuch as that act neither designated street railroads "by name nor by words necessarily indicating the intention to include them, and as such corporations were neither within the letter nor reason of the law, it does not apply to them." It seems quite clear that this much and no more was decided in that case. Indeed it

is a rule universally approved that the meaning of the word "railroad," when employed in a legislative enactment, can only be determined by reference to the context of the act and manifest intention of the Legislature. As said by Mr. Wood in his excellent work on the law of railroads, vol. 1, (1894), sec. 1: "Thus it has often been a question whether the term would include a street railway. The answer must depend upon the character of the statute and the purpose for which it was provided." See also 1 Elliott on Railways, secs. 3, 4, 6. The Supreme Court of Pennsylvania laid down a most reasonable and satisfactory rule on the subject in Gyger v. Railway, 136 Pa. St. 104, as follows:

" 'Railway' and 'railroad' are synonymous and in all ordinary circumstances are to be treated as without distinction, and when either of them is used in a statute and the context requires that a particular kind of road is intended, that kind will be held to be the subject of the statutory provision, but if the context contains no such indication and either of the words are used in describing the subject-matter, the statute will be held applicable to every species of road embraced within the general sense of the word used."

See also Mass. Loan & Trust Co. v. Hamilton, 88 Fed. 588.

So it appears, after all, we must look to the context of the statute before the court and upon taking into account its object and purpose, determine in each case, upon its peculiar facts, the meaning of the word "railroad" therein employed, when endeavoring to ascertain to what class or character of railroads the Legislature intended to apply the regulation provided, and in no case can an accurate determination and result be had except by a constant vigil as to the mischief sought to be prevented and the remedy sought to be provided by the enactment.

2.   With these principles before us, let the examina-

tion of the case before the court be had. The railroad in question is several miles in length, the greater portion of which passes through an agricultural country in St. Francois county. It is chartered for the purpose, and the second franchise granted to it, under section 1187, R. S. 1899, is, "to operate its road by animal, cable, electric or other motive power as the consent to the use of which said power may be obtained from the public authority of such city, town or county." A portion of the road passes through the city of Farmington, a place of about five thousand inhabitants, and makes stops at each and every street crossing when necessary for the accommodation of passengers. Aside from this, it is rural or interurban, rather than urban, and by its charter it is authorized to "receive and collect such fares for the transportation of persons, express and mails as may be provided in the said consent of such public authorities of such city, town or county, given as aforesaid." (Sec. 1187, R. S. 1899.) The motive power selected by it, and presumably authorized by St. Francois county and the city, under the second franchise quoted supra, is electrical rather than animal or cable and falls under the designation of other motive power contemplated by such franchise; its cars are propelled by electricity at a more or less rapid rate of speed, as is usual with such roads, and therefore when in operation, it is a dangerous agency with respect to the rights of those persons who are passengers or employees thereon as well as with respect to the rights of the citizens and other persons along its route to permit their animals to run at large or to pass to and fro upon the highway. Indeed, it may not be so highly dangerous as a stream railroad in operation, inasmuch as the cars are not so heavy nor the motive power and speed so great, generally speaking, and therefore casualties may be more readily averted. Nevertheless the fact remains that it is a dangerous agency, being operated by means of a motive power of great

force, under a charter from the State, in a thickly popu-
lated community, which, if permitted to continue with
its tracks unfenced, is designed to inflict injury to its
patrons and employees aboard the cars on account of
the probability of derailment by means of collisions
with animals on the track, and designed also to in-
flict injury to the property rights of citizens by kill-
ing or maiming such animals as wander upon its tracks
by reason of its failure to fence the same. Now these
are the very rights sought to be protected and rendered
more secure by the provisions of the statute under con-
sideration, therefore the railroad in question falls within
both the spirit and reason of the statute. But it is
suggested, even though it comes within the spirit and
reason thereof, it does not fall within the letter of the
statute, inasmuch as the words "street railroad" are not
therein employed. Now, it may be answered to this sug-
gestion that the words "steam railroad" or "commercial
railroad" are not employed in the statute and, except for
the fact that the statute is found in the article pertain-
ing to railroads, the argument that steam railroads are
not within its letter can be predicated with as much
force on this truth as can the argument that electric
roads, organized under the street railroad law, operat-
ing outside of cities and towns and passing through an
agricultural country for many miles, are not within its
letter. We are not persuaded by this argument in the
least. The suggestion throws no light on the subject,
for the word employed in the statute is "railroad," which
properly applies to either steam or street railroads, and
we therefore ascertain that the defendant, although or-
ganized as a street railroad company, is operating a rail-
road in this State, and it therefore falls within the let-
ter of the statute as well. The statute does not mention
steam railroads nor limit its application thereto, but,
on the contrary, it purports in express terms, to apply
to "every railroad." The first three words of the section

are: "Every railroad corporation."   So much as is pertinent here reads as follows:   "Every railroad corporation formed *or to be formed in this State,* and every corporation to be formed under this article, *or any railroad corporation running or operating any railroad in this State,* shall erect and maintain lawful fences on the sides of its road," etc., etc. (Sec. 1105, R. S. 1899.) It will be observed that the statute not only applies to every corporation then in existence and to every railroad "to be formed under this article," but it applies as well to every railroad *"to be formed in this State,"* and continues, and applies *"to any railroad corporation running or operating any railroad in this State."* These latter words are broad and comprehensive and include all railroads, whether incorporated in this State or not.   Its terms are as comprehensive as the subject itself and includes within its scope the entire import and meaning of the word "railroad."   It is true the defendant was not organized "under this article," the statute quoted being a portion of article 2, chapter 12, R. S. 1899, pertaining to railroads, and the defendant having been organized under article 3 of the same chapter, which latter article pertains to street railroads.   Now both article 2, pertaining to railroads, and article 3, pertaining to street railroads, are parcel of the same chapter and must be read together.   By reference to article 2, in which is found section 1105 under consideration, pertaining to railroads, it is manifest that the article does not contemplate steam railroads exclusively, for in section 1035, parcel thereof, granting powers to the railroad companies organized thereunder, we ascertain that the sixth franchise or power granted to such railroads, is "to take and convey passengers and property on their railroad by the power and force of steam or of animal or by any mechanical power, and to receive compensation."   This clause of the statute evinces that the Legislature, in enacting the general law for the in-

corporation of railroad companies in 1855, looked forward to the utilization of other forces of nature than steam as a motive power to be employed by these agencies for transportation, and therefore contemplated and intended, in providing for the organization of railroad companies, to provide for the incorporation of those which might be operated by electricity or other power as well as by steam. They are, in unequivocal language, authorized to employ steam or animals or "any mechanical power." Of course a railroad operated by electricity would fall within the clause last mentioned, and this defendant is therefore such a railroad as is recognized by article 2 of chapter 12, notwithstanding a special article was added, dealing with street railroads. Article 3, dealing with street railroads was added because it was necessary to make the provisions enabling them to obtain a right of way over streets and other matters incident to municipal interests. As said before, both articles are of the same chapter, dealing with the subject of railroads, and should be read together. Article 3 purports to apply to street railroads, and therefore should be considered special with respect thereto, whereas article 2 purports to deal with railroads, and is not expressly limited to any particular class of railroads, and the provisions of its various sections should not be confined to steam or commercial railroads exclusively unless the statute manifests that such railroads are intended; while on the other hand, if the text of the statute employing the word "railroad" indicates, when considering the mischief sought to be prevented and the remedy therefor, that other railroads were intended as well, then such interpretation must be given as will develop and carry into effect this legislative intention, and likewise certain that the character of the motive power employed, whether steam or electricity or other mechanical power, can render the ultimate fact of a highly dangerous agency none the less. It is certain that the funda-

mental distinction with respect to street railroads and steam or commercial railroads lies in the character of the use of the railroads, and not in the character of the motive power employed by them. [Mass. Loan & Trust Co., v. Hamilton, 88 Fed. 588; Hannah v. Street Railway, 81 Mo. App. 78; 27 Amer. & Eng. Ency. Law (2 Ed.), 51; 1 Elliott on Railroads, sec. 6.]

It is true that in the case last cited, which was one involving the killing of stock under this same statute, the railroad company, although operating a rural or interurban, not an urban railroad, by means of electricity, was organized as a railroad company under the general statutes in that behalf, and not as a street railroad company, and while the court made it clear, and in fact, decided that the motive power employed should not influence the consideration of the question in the least, it rests its judgment of liability against the company, principally upon the two facts that the defendant was incorporated as a railroad and was operating a railroad within the meaning of section 1105, supra. In this latter respect the case is an authority here. It is manifest and the thought runs through the entire opinion, that the court was of the opinion that the defendant would have been liable just the same in that case, whatever statute it was incorporated under, inasmuch as it was operating a railroad and came within the spirit and reason of the statute as well.

In Koken Iron Works v. Robertson Avenue Street Ry. Co., 141 Mo. 228, 44 S. W. 269, it was urged that street railroads were not within the intent of the statutes of 1889, sec. 6741 (now section 4239, R. S. 1899), giving a lien upon the "roadbed, station houses, depots, bridges, rolling-stock, real estate and improvements," of "any railroad company" for which work or labor is done as aforesaid, by said section. The Supreme Court answered the argument by saying, in effect, that much of the statute appeared to be directed against the rail-

roads operated by steam and the steam roads were generally designed by the act, and then said: "But the general terms of the law are also susceptible of application to street railroads, and we find nothing in any part of the enactment to indicate that such obligation is not intended. When we . . . consider the broad objects sought by such legislation, it seems clear that street railroads were not intended to be exempt from liability to respond to such lien claims in a proper case." This seems to be the view of this court on the same question, as appears in St. Louis Bolt & Iron Co. v. Donahoe, 3 Mo. App. 559.

Now in the case of Jerman v. Benton, 79 Mo. 148, it was contended that the stockholders in a street railway company were subject to the double liability imposed on stockholders in all other corporations except ordinary railroads. The argument was that a street railway company was not a railway within the meaning of the fifty-seventh section of chapter thirty-nine of the statutes of 1855, authorizing the formation of railway associations. This section was so worded as to exclude stockholders in ordinary railroad companies from the double liability imposed on stockholders in other corporations. A stockholder of the Bellefontaine Street Railway Company insisted that it was a railroad company within the meaning of chapter thirty-nine of the statutes of 1855 (which corresponds to article 2, chapter 12 of the present statutes) and that hence he enjoyed immunity from double liability as a stockholder. On the contrary it was insisted that a street railway company was not a railroad within the meaning of the original railroad law (article 2 of chapter 12, of the present statutes). This court adopted the other view, holding that a street railroad company was within the scope and purpose of the general railroad statutes and its stockholders not subject to double liability. This holding was approved by the Supreme Court. After saying that

the point for consideration could not be satisfactorily disposed of by considering the various methods of locomotion employed by railroad companies, the opinion of the Supreme Court proceeded to point out that according to even this narrow test, a street railroad company was within the meaning of the general railroad act, resting its argument on the clause we have quoted, which provides for the use not only of steam and animals, but of any kind of power to transport persons and property. The Bellefontaine Street Railway Company was one which was to operate only by horse-power within the limits of St. Louis. Part of its line was outside of the City and could have been operated by other means. The Supreme Court held that even within the city it was a railroad within the meaning of the general laws. The opinion says: "Horse or street railroads, as far as they are employed in cities, serve the same uses and purposes for which railroads are used between distant points in the country; they possess the same essential features as servants of the public, the principal difference being tested by the peculiar character of the territory they are operated in and the safety, comfort and wants of the people in that territory." That decision would seem to be decisive of the present case. There is much more reason for holding an electric railroad running across the country between distant towns is a railroad within the meaning of that section of article 2 which imposes double damages where the line was unfenced, than there is for holding that a horse railroad company, operating entirely within the limits of St. Louis, was a railroad company within the meaning of the section of the article which was construed to exempt stockholders in railroad companies from double liability. The fact that the present defendant happened to incorporate under article 3 of chapter 12 relating to the organization of street railway companies, has nothing to do with the decision of the question at issue.

Defendant is in no real sense a street railway. It does not run over streets. It is a railroad over the country, operated by a mechanical power. For aught we know, it may have stations, though that is an unimportant point. Of course there are many provisions in article 2 inapplicable to electric roads; for instance, to provide cabooses, double-deck cars, blow steam whistles at crossings, etc., etc. Because it cannot and is not required to do these things, it by no means follows that it need not do other things which are applicable to it. Now the purpose of this statute is manifest. It is a proper regulation imposed by the State in virtue of its police authority to prevent the operation of such dangerous agencies as it has chartered to maintain and operate railroads from inflicting unnecessary injury to its patrons and employees aboard its cars which are likely of derailment from animals coming upon its tracks (3 Elliott on Railroads, sec. 1182), and further, to prevent the killing and maiming of such animals owned by persons in the community or elsewhere. It is a wholesome law, designed primarily to furnish a reasonable degree of protection at least against the probabilities of injury, as indicated, and it is a fact understood by all that the result is the same to either passenger or employee who is injured by the derailment of the car, as indicated, as is the loss the same to the person whose animal is either killed or maimed thereby, whether the car is propelled by steam, electricity or other motive power. And as to the proposition that the railroad fencing statutes do not apply to rural or interurban railroads organized under the street railroad statutes, we must admit our inability to appreciate the distinction, when viewed from a practical standpoint, with the manifest purpose and intention of the fencing statutes before us. Either railroad, operated as it is through an agricultural country, possesses an element of great danger to the passenger, employees and the animals along the route,

and to the farmer whose cow is killed or injured by reason of the neglect of the corporation to fence, it is wholly immaterial whether it was chartered as a street railroad or steam railroad, just as it is immaterial whether it be propelled by steam or electricity; and indeed, it is a refined distinction to hold that the farmer must be required to read the charter of the railroad company to ascertain whether it is liable for the value of his cow killed by it, when the cow was killed on a railroad track by a railroad car because the railroad had failed to fence, and under such circumstances as to affix liability therefor against the railroad company under the general statutes requiring railroads to fence.

It is suggested that the statute is penal in its nature and therefore cannot be extended beyond its clear import. This is true, and the court must abide by the rule suggested. We are not extending the statute, however. We are only giving life and vigor to its plain letter and manifest spirit. Now the rule of strict construction, pertaining to penal laws, like all other rules of construction, must surrender to the first and cardinal principle of all construction, which is, that the intention of the law-makers, when ascertained, must be carried into effect by the court if not prohibited by constitutional limitations. We find, as pointed out above, that the railroad in question is within both the letter and spirit of the statute, and therefore it is manifest that the Legislature intended that railroads of this class, when engaged in operating their cars through the country between towns, should fence their tracks as other railroads are required to do under like circumstances. The reasons demanding fences are the same in either case.

There is a provision in the statute under consideration as follows:

"If any corporation aforesaid shall, after three months, from the time of the completion of its road through or along the lands, fields or inclosures hereinbe-

fore named, fail, neglect or refuse to erect or maintain
in good condition any fence, opening or farm crossings
or cattle-guards as herein required, then the owners or
proprietors of said lands, fields, or inclosures may erect
or repair such fences, openings, gates or farm crossings
or cattle-guards, and shall thereupon have a right to sue
and recover from such corporation in any court of com-
petent jurisdiction the cost of such fences, openings,
gates, cattle-guards or repairs, together with a reason-
able compensation for his time, trouble and labor in
and about the construction of such fences, openings,
gates or cattle-guards, or the making of such repairs,
together with ten per cent interest per annum thereon,
from the time of the service of process upon such cor-
poration in such suit: Provided, that before such re-
pairs are commenced, such owner shall give five days
(5) notice in writing to the railroad company, by de-
livering a copy thereof to the nearest section foreman
or station agent of such railroad company, that the rail-
road fence needs repairs at a place or point named in
the notice on the lands of such owner." [See 1105, R.
S. 1899.]

It is suggested that this provision relating to five
days' notice to the section foreman or depot agent prior
to the fences being erected by the owners or adjoining
proprietors evinces that the Legislature had in mind
only steam or commercial railroads inasmuch as those
roads are known to usually employ depot agents and
section foremen and maintain depots, whereas such is
not the usual practice of electric railroads organized
under the statutes pertaining to street railroads. What-
ever may be the practice of electric railroads in this
behalf, we must read the statute in connection with the
other legislation on the subject and we find in section
1187, R. S. 1899, being parcel of article 3, pertaining to
street railroads, that the fifth franchise granted to street
railways is: "To purchase and acquire depots, power-

houses, sites and terminals." From this, it is manifest
that the Legislature contemplated that even street rail-
roads should, if they saw fit, maintain depots and no
doubt depot agents in connection therewith, and especi-
ally so if they operate long lines across the country. It
is a well known fact that they do employ a large number
of men, commonly known as section men, in keeping the
roadbed in repair, and these men are in charge of a fore-
man, the same as a section foreman of other railroads.
And it appears that the provisions of the statute above
quoted are therefore not inconsistent with the views ex-
pressed by the court herein. It is no doubt true that the
Legislature did have in mind steam railroads, such as
are known to maintain depots, depot agents and section
foreman, but this in no wise excludes the notion that
it did not intend as well to apply the statute to electric
or street railroads, when they embark in the business of
running over the country, outside of cities and towns.
By its plain words, it says it applies to "any railroad
corporation running, or operating any railroad in this
State," and to every railroad "to be hereafter organ-
ized," and the fact that street railroads do have section
men in their employ, together with the franchise and its
provision authorizing them to erect and maintain de-
pots, seems amply sufficient to bring it within the con-
templation of the statute quoted. Be this as it may,
however, we are of the opinion that the mere fact that
this provision evinces the purpose of the Legislature to
level the statute against such roads as were known to
maintain station agents and section foreman, about
which there can be no controversy, does not exclude the
idea that the Legislature purposed as well to level its
provisions against all such railroads as traverse the
agricultural portions of the State, where cattle are
likely to go upon its track and occasion the twofold ca-
lamity of derailing the car to the injury or death of pas-
sengers and employees, or the killing and maiming

of the animals with which the collision is had, even though such roads do not maintain depots, depot agents and section foremen. In view of the very comprehensive language used by the Legislature and the reason and spirit of the law as well, we are not inclined to hold that the law-making power intended anything less in this respect than what is said, if the words "any railroad corporation running or operating any railroad in this State," and every railroad "to be hereafter organized," as expressive of the comprehensive purpose of the law-makers in respect to the principal object of the law itself, are to be limited in their application so as to exclude certain railroads from the provision of the words "any railroad," by the influence and context of the subsequent provisions relating to such a mere incident to the general purpose of the act, as is the incident pertaining to how a recovery may be had for erecting fences in event the railroad fails for three months to do so and they are constructed by the adjoining proprietors, then it should be done by the court of last resort, the judgment of which would no doubt have such influence on the subject as to bring it immediately before the Legislature and occasion an amendment to the section, if in the wisdom of the legislative authority, an amendment would be proper. The fact is, the rural or interurban railroad organized as a street railroad is now a factor with which the courts are compelled to deal, and the earlier their status is ascertained and settled by the courts, the better for the peace and repose of society.

Entertaining this view, we are of opinion that the defendant is liable in this case unless the next question to be considered relieves it therefrom.

3. It is urged that the railroad, being located in the public road by permission of the county court, it could not be required to fence such road as it would obstruct the highway. In the first place, it must be borne

in mind that this statute requiring the railroads to fence their tracks, is not exclusively for the owner of the animal nor for the benefit of the adjacent proprietors but is in the nature of a police regulation designed to promote the security of persons and property generally. [Robinson v. C. & A. Railway, 57 Mo. 494; Jackson v. Railway, 43 Mo. App. 324.] The fact that the railroad ran along the north edge of the public road does not operate to relieve the railroad company from its duty to maintain fences for the purpose as above indicated, for it has long since been settled beyond controversy that the statute requires fences to be erected everywhere outside of towns and cities except at the crossings of public and private roads and necessary station grounds. [Morris v. Railway Co., 79 Mo. 367; see also Accord v. Railway Co., 113 Mo. App. 84, 87 S. W. 537.] And it has been frequently decided that when a railroad runs along and abutting a public road, this in no sense relieves the obligation to fence. [Rozzelle v. Railway, 79 Mo. 349; Morris v. Railway, 79 Mo. 371.] And this is true, even though the defendant's railroad encroaches upon a public road, as was decided in Emerson v. Railway Co., 35 Mo. App. 621. For, as well said in that case, and by the Supreme Court in Robinson v. C. & A. Ry. Co. 57 Mo. 494, a railroad running along a highway is required to be fenced with especial care and watchfulness because of the increased dangers to the public and its property. [Citing 1 Redfield on Railways (5 Ed.), 517.]

It is unnecessary to multiply words on this question. The mere fact that the railroad was constructed on the right of way of the public road by permission of the county court cannot relieve it of its statutory duty to fence. On the contrary, its location there could only enhance such duty, if there be such a thing as rendering a duty more mandatory in one instance than another, for on a public thoroughfare there is greater likelihood

of inflicting injuries than otherwise. And as a correlative, special care should be exercised to prevent such injuries. The county court could grant no authority to the company to operate its road in a manner violative of this positive statute which would operate to relieve it from the duties thereby imposed and its duty to maintain fences remains the same wherever it is located, outside of towns and cities and if such a fence in the highway constitutes a public nuisance, or if the railroad itself constitutes a public nuisance, it is immaterial so far as this case is concerned. Those questions are not before the court in this case.

The judgment of the learned circuit judge was correct and will be affirmed. It is so ordered. *Goode, J.,* concurs: *Bland, P. J.,* dissents.