Argued September 10, affirmed September 22, 1914.

# McCALLISTER *v.* SAPPINGFIELD.

(144 Pac. 432.)

**Animals—Property Rights—Dogs—"Personal Property."**

1.   Section 5731, L. O. L., declaring dogs to be "personal property," is merely a legislative declaration of present-day common law.

> [As to property in dogs and its enforcement, see note in 67 Am. St. Rep. 288.]

**Evidence—Relevancy—"Market Value."**

2.   The 'market value" of property is the price it will bring in a fair market, after reasonable efforts have been made to find a purchaser who will give the highest price for it.

**Evidence—Relevancy—Value.**

3.   In an action for the killing of a dog, where it has no market value, the owner may prove its special value to him by showing its qualities, characteristics and pedigree, and may offer the opinions of witnesses who are familiar with such qualities.

From Marion: Percy R. Kelly, Judge.

This is an action by M. D. McCallister against Henry Sappingfield to recover the value of plaintiff's dog that was killed by the defendant. A jury trial resulted in a verdict in the sum of $200 and defendant appeals.                               Affirmed.

For appellant there was a brief and an oral argument by *Mr. Grant Corby.*

For respondent there was a brief over the name of *Messrs. Smith & Shields,* with an oral argument by *Mr. Guy O. Smith.*

Department 2.   Mr. Justice McNary delivered the opinion of the court.

As a *solatium* for the loss of a Scotch collie dog, plaintiff was awarded damages against defendant in the sum of $200.   The complaint recites that in Oc-

tober, 1912, defendant without cause purposely shot and mortally wounded plaintiff's dog, which was of the reasonable value of $200. Following a general denial, defendant in his answer alleges as a separate defense that the animal was vicious and in the habit of attacking pedestrians and travelers along the public road; that on the day in question, while passing along the county thoroughfare on horseback, accompanied by a young dog, plaintiff's canine charged viciously upon defendant's horse and dog, and in order to repel the assault defendant fired at plaintiff's dog. This defense was denied by plaintiff.

But a single question is presented upon appeal, and that is: Did the circuit judge commit error when he admitted in evidence, notwithstanding the objection of counsel for defendant, the following testimony given the plaintiff?

"Q. I wish you would state whether or not the dog was trained as a stock dog on the ranch.

"A. Yes, sir; he was.

"Q. Tell the jury what you used him for.

"A. Well, I trained that dog from a puppy up to get my cattle for me of nights and mornings, round up the goats and bring them in; in fact, I used him every day. He was trained so all I had to say was to get the cows, and he would go out in a 30 or 40 acre field, in the brush and timber, and he would bring them up just like you would go and get them yourself, and there was a creek—the Pudding River divides the land—and I lived on the east side. The cows and stock would cross the creek. There is a large pond there, probably between 100 and 150 yards across. He would come from the barn with the cows, I knew they were not on that side of the creek. I could send him across the creek into a field there of 30 or 40 acres of timber, and he would go over there and bring the cows up, and bring them down and across the creek, and bring them

up, and save me possibly one or two hours' labor a day by bringing up my cattle, and I would send him after a band of goats, half a mile after goats, and he would round them up and bring them in, and the same with driving cattle and goats. He was one of the most useful dogs I ever owned. I have owned a good many dogs, and he would stand training. Other dogs I have had you couldn't train. I would buy a dozen different dogs and try to train them, but they would not develop anything good. This fellow was exceptionally bright, and would mind instantly, and was very useful.

"Q. Mr. McCallister, you stated that you had owned several dogs before?

"A. Yes, sir; we have had several dogs there on the place.

"Q. Are you familiar with the value of dogs?

"A. Well, I think I am, a good farm dog.

"Q. What would you consider the value of this dog?

"A. Well, gentlemen, the dog wasn't for sale.

"Q. What would you consider him reasonably worth?

"A. I think he was worth $500; I wouldn't have sold him for a cent less, because he was more useful to me than a span of horses was. When the dog was killed I was away in Eastern Oregon, down there possibly two or three months. I left my wife on the ranch alone, and she stayed there alone, and the dog stayed there with her. She wasn't afraid to stay, because the dog was a protector to her, and at that time she had come to Eastern Oregon about three or four weeks, and left the dog with my father."

Testimony similar in nature and to which objection was made was given by William McCallister, father of the plaintiff. It is not necessary to repeat this testimony, as it must stand or fall according to the principle applied to the testimony of plaintiff.

1. The particular objection interposed to the testimony by the learned counsel is that it allowed plain-

tiff to prove the value of the dog by a recital of its "traits, habits and intelligence"; whereas plaintiff should have been confined to a proof of the market value of the animal. Counsel argues in his brief that the value "of an animal is the market value; what it would cost the plaintiff to go out in the market and secure another dog of the kind and quality of the one lost." Counsel finds his haven for this argument in Section 5731, L. O. L., which says that "dogs are hereby declared to be personal property." This enactment is but a legislative declaration of the present-day common law, found in the decisions of most of the states of the Union. This modern conception of the dog as personal property, whether embodied in legislative enactments or judicial decisions, is the natural evolution of the status of the dog as known at common law which considered the animal to be property, yet of an inferior sort: *Woolf* v. *Chalker,* 31 Conn. 121 (81 Am. Dec. 175); *Jemison* v. *Southwestern R. R.,* 75 Ga. 444 (58 Am. Rep. 476); *State* v. *Topeka,* 36 Kan. 76 (12 Pac. 310, 59 Am. Rep. 529; 1 R. C. L. 1113). However, the statement is occasionally found in the books that at common law a dog is not considered property by reason of the baseness of its nature, being kept merely to satisfy a human whim or pleasure: *Citizens' Rapid Transit* v. *Dew,* 100 Tenn. 317 (45 S. W. 790, 66 Am. St. Rep. 754, 40 L. R. A. 518). In *Mullaly* v. *People,* 86 N. Y. 365, the court said in substance, very enthusiastically, that when we call to mind the fact that a small spaniel saved the life of William of Orange, and thus changed the current of modern history, and when we consider the faithful St. Bernards, which rescue travelers caught in the storms which sweep over the crests and sides of the Alps, the

claim that the dog is base in his nature is overthrown, and he cannot be left a prey to every person who chooses to steal or kill him. The rule of the common law was technical in the extreme, for, while it was not larceny by it to steal a dog while living, it was larceny to steal his hide after he was dead. Large amounts of money are now invested in dogs, and they are extensively the subjects of trade and traffic. They are the negro's associates, and often his only property, the poor man's friend, and the rich man's companion, and the protection of women and children, hearthstones and hen-roosts. In the earlier law books it was said that "dog law" was as hard to define as was "dog Latin." But that day has passed, and dogs have now a distinct and well-established status in the eyes of the law. From a study of the cases, we believe that the statute of our state has not added to, but simply reaffirmed, the legal station of the dog as understood at common law. We find that poetry and history has been cited in his behalf and his achievements recounted in glowing language; this concept being caught up by the immortal bard who sang:

> "But the poor dog, in life the firmest friend,
> The first to welcome, foremost to defend,
> Whose honest heart is still his master's own,
> Who labors, fights, lives, breathes for him alone,
> Unhonour'd falls, unnoticed all his worth,
> Denied in heaven the soul he held on earth;
> While man, vain insect, hopes to be forgiven,
> And claims himself a sole exclusive heaven."

2, 3. We come now to consider the vitals of this case, and that is the character of evidence that may be introduced to prove the value of a dog in an action of this nature. The "market value" of property is the price which the property will bring in a fair market, if reasonable efforts have been made to find a purchaser who will give the highest price for it: 5 Words

and Phrases, p. 4383.   But is the market value the only criterion by which to estimate the extent of recovery in a case of this kind?   We think not.   In the well-considered case of *Prettyman* v. *Oregon R. & N. Co.*, 13 Or. 341 (10 Pac. 634), Mr. Chief Justice LORD said:

"When property which has a market value has been destroyed, and a recovery in damages is sought, the inquiry is as to the market value of such property. In such case, the market value of such property is the proper measure of damages.   It furnishes the standard by which the damages may be ascertained and measured; for the money value thus ascertained is the price at which property could be replaced for money in the market.   But property may have a value for which a recovery may be had if it is destroyed, although it may have no actual market value.   'There may have been no sales in that region,' said VALENTINE, J.   'There may have been no market value for the corn there.   If so, then some other criterion of value must be adopted.   It is not necessary in any case that there should be an actual market value for an article in order to entitle the owner thereof to a recovery for its destruction.' "

And this principle of law has been applied in actions to recover for the destruction of a dog.   The true rule being that the owner of a dog wrongfully killed is not circumscribed in his proof to its market value, for, if it has no market value, he may prove its special value to him by showing its qualities, characteristics and pedigree, and may offer the opinions of witnesses who are familiar with such qualities: *Hodges* v. *Causey*, 77 Miss. 353 (26 South. 945, 78 Am. St. Rep. 525, 48 L. R. A. 95); *Heiligmann* v. *Rose*, 81 Tex. 222 (16 S. W. 931, 26 Am. St. Rep. 804, 13 L. R. A. 272); *Bowers* v. *Horen*, 93 Mich. 420 (53 N. W. 535, 32 Am.

St. Rep. 513, 17 L. R. A. 773). In that new and final word on Case Law (1 R. C. I. 1130) the editors say:

"It may, however, be conceded that dogs have no intrinsic value, if by that is meant a value common to all dogs as such, independent of the particular breed or individual. Therefore, in determining the amount of recovery, the facts and circumstances of the particular case in hand are all important, although, of course, the question of value must be left to the jury. In an action to recover for the injury, destruction, or asportation of a dog, the basis of recovery may be either the market value, if the dog has any, or some special or pecuniary value to the owner that may be ascertained by reference to the usefulness or services of the dog. To assist in the proper determination of the value of dogs, experts may be allowed to give their opinions with respect thereto; the opinions being based either on actual sales or their general observations and experience. And for the same purpose evidence of a dog's pedigree, and of the qualifications and performances of his ancestors, is competent, as well as testimony relative to his own peculiar characteristics and qualities."

From what has been said, we believe the Circuit Court was guided by wisdom and principle in permitting the testimony to go to the jury on the question of value. Judgment must be affirmed. Affirmed.

Mr. Chief Justice McBride, Mr. Justice Eakin and Mr. Justice Bean concur.