UNION TRACTION CO. *v.* J. C. ANDERSON *et al.**

(*Nashville.* December Term, 1921.)

1. **RAILROADS.** Fencing statute enacted for public safety.

Acts 1891, chapter 101, requiring railroad companies to fence their tracks, was enacted primarily in the interest of the general public, and for the safety of public travel, and must be given a construction which will not defeat the salutary purposes of its enactment. (*Post, pp.* 484-489.)

Acts cited and construed: Acts 1891, ch. 101; Acts 1875, ch. 142; Acts 1903, ch. 59.

Cases cited and approved: Railroad v. Crider, 91 Tenn., 496; Railroad v. Thompson, 101 Tenn., 201; Stem v. Interurban Railway, 142 Tenn., 503; Muskogee Electric Traction Co. v. Doering, 2 A. L. R., 94; Massachusetts Land & T. Co. v. Hamilton, 88 Fed., 588; Riggs v. Railroad, 120 Mo. App., 335; Evans v. Utica & M. Valley Ry. Co., 44 Misc. Rep., 345.

2. **RAILROADS.** Electric interurban railway held a "railroad," within fencing act.

The railroad fencing act (Acts 1891, chapter 101), requiring "railroad" companies to fence their tracks, applies to an electric interurban railway operating under a commercial railroad charter granted under Shannon's Code, section 2412, as a carrier of both freight and passengers transported along a private right of way of its own. (*Post, pp.* 484-489.)

3. **RAILROADS.** Fencing of private crossing required by statute.

An electric interurban railway company, killing a bull which strayed on an unfenced crossing over a private way which led to a grass lot or pasture, *held* liable under the fencing act (Acts 1891, chapter 101, sections 2, 3); it being practicable to fence the track and to maintain gates, and the obstruction of such way not being prohibited by statute. (*Post, pp.* 488-491.)

---

*On private action for violation of statutory duty to fence right of way, see notes in 9 L. R. A. (N. S) 347, and L. R. A. 1915E, 539.

Union Traction Co. v. Anderson.

Case cited and approved: Greer v. Railroad, 104 Tenn., 243.

4. **EVIDENCE. Excluding testimony of expert witness as to value of pure-bred cattle held not error, in view of witness' admissions as to qualifications.**

In an action for damages for killing of a Jersey bull by defendant's train, excluding testimony of a witness in the nature of that of an expert as to the value of the animal, *held* not error, where the witness admitted he had never raised pure-bred Jersey cattle, and admitted he had not informed himself in such matters, and stated that he could not tell any thing about the pedigree of the animal in question, and that he was not familiar with pedigrees. (*Post*, *pp.* 491, 492.)

Cases cited and approved: Roper v. Memphis Street Railway, 136 Tenn., 29; Powers v. McKenzie, 90 Tenn., 167; Bruce v. Beall, 99 Tenn., 303.

5. **APPEAL AND ERROR. In an action for the killing of a Jersey bull, statement of court as to procuring expert witnesses who knew value not prejudicial error.**

In an action against an interurban railroad for the killing of a Jersey bull by its train, the trial judge's statement, in excluding the testimony of an expert witness as to value, that, if he were ruling on something that counsel could not get, he would say that his ruling would not be sound in every respect, but there were many people thoroughly conversant with such things, and he thought it better to have the testimony of such people thereon, *held* not equivalent to saying that the jury should not regard the testimony of another witness who had testified, nor that the defendant did not want to introduce witnesses who would show the real value of the animal, and hence not prejudicial error. (*Post*, *pp.* 492, 493.)

6. **EVIDENCE. Evidence of seller's price, asked one year prior to killing of animal, held inadmissible to show value.**

In an action for killing a Jersey bull, testimony that plaintiffs offered to sell witness the animal in question about a year and a half before he was killed, for $100 is clearly incompetent to es-

tablish the the value at the time the animal was killed. ʼ(*Post, pp.* 493, 494.)

7. **TRIAL.** Refusal of cantionary instruction on evidence of experts not held error.

In an action against an interurban railroad company for the neg-ligent killing of a bull, refusing an instruction cautioning on ex-pert testimony as to value or market price *held* not error. (*Post, pp.* 494-496.)

Cases cited and approved: Persons v. State, 90 Tenn., 291; United States v. Pendergrast, 32 Fed., 198; Fisher v. Insurance Co., 124 Tenn., 450.

Case cited and distinguished: Wilcox v. State, 94 Tenn., 106.

8. **DAMAGES.** Evidence held to sustain verdict for $1,750 for kill-ing of a Jersey bull.

In an action against an interurban electric railway for killing a Jersey bull, evidence as to value of the animal *held* to sustain a verdict for plaintiff for $1,750. (*Post, pp.* 496, 497.)

9. **EVIDENCE.** Pedigree and records of registration to be considered in determining animal's value.

Evidence as to pedigree and records of registration are to be con-sidered by the jury in determining value of animal killed. (*Post,* p. 497.)

Case cited and approved: Citizens' Rapid Transit Co. v. Dews, 100 Tenn., 317.

---

FROM DAVIDSON.

---

Appeal from the Circuit Court of Davidson County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.—HON. E. F. LANGFORD, Judge.

Union Traction Co. v. Anderson.

J. T. BASKERVILLE and JOHN A. BELL, for plaintiffs.

F. M. BASS and CECIL SIMS, for defendant.

MR. JUSTICE HALL delivered the opinion of the Court.

An action of damages instituted by J. C. Anderson and W. L. Pierce, who will hereinafter be referred to as the plaintiffs, against the Union Traction Company, who will hereinafter be referred to as defendant, to recover for the alleged wrongful and negligent killing of a Jersey bull belonging to plaintiffs in a collision with an electric car of defendant on the night of August 1, 1919, at a point on defendant's track between Hendersonville and Saunders-ville, in Sumner county, Tenn.

A trial of the case in the circuit court before the court and a jury resulted in a verdict in favor of the plaintiffs for the sum of $1,750.

Defendant made a motion for a new trial, which was overruled, and judgment being entered in accordance with the verdict of the jury, defendant appealed to the court of civil appeals. That court affirmed the judgment, and defendant has brought the case to this court by its petition for the writ of *certiorari* and for review.

On the day of the accident the animal in question, without the knowledge or fault of its owners, escaped from the inclosure in which he was kept on the premises of the plaintiff J. C. Anderson, and went upon the right of way and track of the company at a point between the stations of Hendersonville and Saundersville, and while upon the track he was struck and run over by one of the defendant's moving cars, which was being operated by its agents and

servants, whereby he was fatally injured and died shortly thereafter.

The plaintiffs' declaration consisted of two counts. In the first count it was averred that at the place where the bull went upon the right of way and track of defendant, and at the place where he was wrongfully struck and killed by its moving car, the track and right of way was unfenced and without cattle guards, or other barriers, to prevent live stock from going upon the right of way or track, which right of way and track, at the point where the animal was killed, could and should have been fenced and equipped with cattle guards as the law provides.

It was further averred that the fatal injuries to said animal were the direct and proximate result of the negligence of defendant, and its failure to provide fences and cattle guards as required by statute.

In the second count it was averred that while the animal was on the track of the defendant he was wrongfully and negligently run upon, over, and against by one of defendant's moving cars, operated at the time by its agents and servants, whereby he was fatally injured to such an extent that he died shortly thereafter, and that such fatal injuries were the direct and proximate result of defendant's negligence.

To the plaintiffs' declaration defendant filed a plea of the general issue, and it was upon these pleadings and proof that the case was submitted to the jury, with the result before stated.

The plaintiffs are Sumner county farmers, living in the vicinity of Hendersonville and Saundersville, two small villages situated within a comparatively short distance of each other. They are both breeders of purebred Jersey cat-

tle, and owned jointly the bull in question. The bull was kept upon the farm of the plaintiff Anderson, who made a specialty of producing a strain of pure-bred Jersey cattle, peculiarly noted for the production of an unusually large amount of butter fat. This bull was at the head of his herd. The animal was a product of the farm of the plain- tiff W. L. Pierce, and when it was a small calf he turned it over to the plaintiff Anderson, with the agreement that, if the latter would keep and develop him until his value as a breeder was finally determined, they would own him jointly; each owning a one-half interest in said animal.

It appears from the proof that the value of a registered Jersey bull largely depends on the record that he makes as a breeder. This record is largely controlled by the man- ner in which he is developed. If he is able to produce heif- ers with high butter fat records, then he becomes a very valuable animal.

The residence of the plaintiff Anderson is situated on the south or easterly side of the Nashville and Gallatin turnpike, and is about one-fourth of a mile from the pike. His farm, however, extends up to and fronts along the pike.

The defendant is a corporation, and operates an inter- urban line of railway between Nashville and Gallatin un- der a regular commercial railroad charter, and carries both freight and passengers for hire. Its cars are operated by electric power, and with the exception of points where they cross the public highways its tracks are constructed and operated on a right of way over private property, which it acquired from private landowners under its power of eminent domain or by purchase. The cars operated on its track are larger than the ordinary street car, and at times it operates two cars coupled together.

The track of defendant, at the point where the animal in question was killed, and in that immediate neighborhood, runs along the north or westerly side of the turnpike for a distance of several miles, and at the point of the accident, and for some distance on each side thereof, the turnpike and defendant's track run practically parallel, running in a northeasterly and southwesterly direction; the rights of way of the two being separate, but adjoining.

The farm of R. E. Long is on the south or easterly side of the turnpike, and the farm of D. P. Adams is on the north or westerly side of defendant's track; the right of way of defendant at that point having been acquired from said Adams.

For some distance southwest of the point of the accident the defendant's track extends through a cut. Gradually emerging from this cut, it extends a short distance on a level with the adjoining land, and then proceeds across a fill in a northeasterly direction. The turnpike is in a cut, but extends over the top of the hill parallel with the cut, reaching the same level of the defendant's track where the latter emerges from the cut; then the pike extends across a separate fill, parallel with the fill on which the railroad track is located. Immediately opposite the point where the pike and defendant's track are on a level with adjoining land, there is a farm gate entering a field of Mr. Adams on the north or westerly side of the track. A way has been constructed across the defendant's track, leading from the pike to said farm gate. There is a fence between the property of Mr. Long and the turnpike on the south or easterly side, and a fence, of which the gate is a part, between Mr. Adams and defendant's right of way on the north or westerly side. There is no fence between the pike and defend-

ant's track, except a guard rail along the rim of the cut for some distance south of the point of the accident.

The next morning after the accident the bull was found about four or five feet from the south or easterly side of the track. The injuries upon him showed that he had been struck in the rear or rump, and his right leg was broken. The proof is undisputed as to the time, place, and manner of the accident. It is not in harmony, however, as to the exact place where the bull went upon the track and was struck by the moving car. There were marks on the track which showed that he entered upon the track six or eight feet south of the private crossing that led to the farm gate, which opened into the field of Mr. Adams, and also marks showing that he had been pushed or shoved across the crossing, and between the rails, to a point several feet to the north side of said crossing.

Thomas S. Jones, the motorman engaged in operating the car at the time of the accident, and who testified on behalf of the defendant, stated that the car was on its way from Nashville to Gallatin, and passed the point of the accident just a few minutes after 12 o'clock a. m. He testified that he was running at the rate of twenty miles an hour when the bull suddenly entered upon the track about twenty feet ahead of the moving car, whereupon he immediately applied his brakes, but did not have time to take any other precautions to prevent colliding with the bull. He stated that the bull "rushed" or "ran" upon the track towards the moving car, but suddenly stopped, turned around, and headed in the opposite direction.

G. A. Carter, the conductor on the car, testified, in substance, that after the bull made his appearance on the track the motorman "eased" up the speed of the car and

ran about one hundred feet, and then applied the air brakes. He also testified that the alarm whistle could have been sounded between the time the motorman began to "ease" up the speed of the car and the time the air brakes were put on, immediately before the collision.

The trial judge was of the opinion that defendant was, as a matter of law, required to fence its track at the point in question, and, the uncontradicted proof showing that this requirement had not been complied with, he instructed the jury that defendant was liable, and submitted to the jury the question of the amount of damages only.

By defendant's first assignment of error it is insisted that the trial judge committed error in instructing the jury that chapter 101, Acts 1891, known as the railroad fencing act, applied to electric interurban railways, and that the court of civil appeals should have reversed the judgment for this error. This is the first question presented for determination.

Chapter 101, Acts 1891, requiring railroad companies to fence their tracks, was enacted primarily in the interest of the general public and for the safety of public travel. *Railroad* v. *Crider,* 91 Tenn., 496, 19 S. W., 618; *Railroad* v. *Thompson,* 101 Tenn., 201, 47 S. W., 151.

It must therefore be given a construction which will not defeat the "salutary purposes," which the legislature had in mind at the time of its enactment. *Stem* v. *Interurban Railway,* 142 Tenn., 503, 221 S. W., 192.

By section 2 of said act it is provided:

"That any person, company or corporation, or lessee or agent thereof, owning or operating any railroad within the State of Tennessee, shall be liable for the value of any horse, cow or other stock killed, and reasonable damage

Union Traction Co. v. Anderson.

for any injury to any such live stock upon or near the track of any railroad in this State, whenever such killing or injury is caused by any moving train, or engine or cars upon such track: Provided, that contributing negligence on the part of the plaintiff in any action or suit to recover damage for such killing or injury, may be set up as a defense; but, provided further, that the allowing of stock to run at large upon common unfenced range, or upon inclosed land owned or in possession of the owner of such stock, shall not be deemed or held to be such contributory negligence; provided further, that in any such suit or action, proof of willful intent on the part of the plaintiff therein to procure the killing or injury of any such stock, in the manner aforesaid, shall defeat the recovery of any damages for such killing or injury."

Section 3 provides:

"That no person, company or corporation owning or operating any railroad in this State, shall be liable under the foregoing section of this act, for any damage for the killing or injury of any such live stock, when the track of said railroad is inclosed by a good and lawful fence and good and sufficient cattle guards."

The business, character, and nature of interurban railways are not that of the ordinary street railway usually operated in cities and their suburbs, and decisions concerning the latter on the question of their liability under the railroad fencing statute and similar questions are inapplicable to the former. *Stem* v. *Railway*, supra.

The words "railroad" and "railway" have substantially the same meaning, and are used synonymously. The mode of construction and chartered use, not the motive power, are controlling factors in determining the character of the railway in question. 23 R. C. L., sections 3, 4.

The rule is announced by Mr. Elliott, in his valuable work on Railroads (volume 3 [2d Ed.], section 1096bn), that the requirements of a fencing statute apply to interurban railways unless such railways be expressly exempted therefrom by its terms.

To the same effect is the holding of the court in *Muskogee Electric Traction Co.* v. *Doering* (Okl. Sup.), 2 A. L. R., 94, 172 Pac., 793. In that case it was held that a corporation chartered to and operating and maintaining an electric street railway and a suburban or interurban line, for the purpose of transporting passengers, mail, and freight, and in pursuance of such power builds and operates a line from without the limits of a municipal corporation to another point without such municipality, for a distance of several miles, through an agricultural section, such line of road being built and operated along private rights of way of said corporation, and not along a public highway, such corporation is liable for damages for the killing of stock in the event it fails to fence and erect cattle guards along said line, without such municipal corporation, as provided by section 1435, Revised Laws of 1910, regardless of the fact that it is not guilty of other negligence than the failure to erect such fence and build such cattle guards. The statute (section 1438) involved in that case provided as follows:

"Whenever any railroad corporation, or the lessee, person, company or corporation operating any railroad, shall neglect to build and maintain such lawful fence, such railroad corporation, lessee, person, company or corporation operating the same, shall be liable for all animals killed by reason of the failure to construct such fence."

In that case it was held that a railroad, within the meaning of section 1435 of the Revised Laws of 1910, is any road laid out and graded, having parallel rails of iron or steel for the wheels of carriages or cars to run upon, and upon which cars are operated for the carriage of passengers or freight; without regard to the motive power by which its cars are propelled.

Substantially the same definition is given to railroads in 33 Cyc., 33; *Massachusetts Loan & T. Co.* v. *Hamilton,* 88 Fed., 588, 32 C. C. A., 46.

In *Riggs* v. *Railroad,* 120 Mo. App., 335, 96 S. W., 707, it was held that a street railway organized under article 3, chapter 12, of the Revised Statutes of 1899, with authority to operate its railroad by "animal, cable, electric or other motive power" to "transport passengers, express and mails," and running the greater portion of its length through an agricultural country, is a "railroad corporation," within the meaning of section 1105, Revised Statutes of 1899, and liable for double damages for animals killed by its failure to fence its track where it runs through inclosed or cultivated fields or uninclosed lands. The statute there involved reads as follows:

"Every railroad corporation formed or to be formed in this State, and every corporation to be formed under this article, or any railroad corporation running or operating any railroad in this State, shall erect and maintain lawful fences on the sides of its road," etc.

To the same effect is the holding of the court in *Evans* v. *Utica & M. Valley Ry. Co.,* 44 Misc. Rep., 345, 89 N. Y. Supp., 1089.

There is nothing in the character of business or in the method of operation of an interurban railway that dis-

tinguishes it from a railway system operated by steam; so far as the primary purposes and results sought to be attained by the railroad fencing act are concerned. The record discloses that defendant has and operates under a commercial railroad charter granted by the State under the provisions of section 2412 of Shannon's Code. It is a carrier of both freight and passengers, and operates between towns or cities along a private right of way of its own. Its cars are of a heavier, larger, and more powerful type that the ordinary street railway cars. Such railway chartered, as it is, under a regular commercial railway charter, and possessed with the same rights and privileges, we think it is clear that it should be operated with the same liability and restrictions and controlled by the same regulations. The fact that it is onerated by electricity and not by steam is immaterial. Instead of making a distinction between railways operated by steam and those operated by electricity, the legislature, by chapter 433, Acts 1907, has put them in exactly the same class where the character of business is the same. That act provides that an electric railroad or railway company theretofore or thereafter engaged as such under the provisions of chapter 142, Acts 1875—"shall have and possess the same powers and privileges as are conferred by that act upon railroad and railway companies, and be subject to the same duties and obligations."

Chapter 59, Acts of 1903, authorizes steam railroads to adopt electricity as its motive power, thus clearly showing the express intention on the part of the legislature to make no distinction between railroads whose cars are operated by steam and those operating their cars by electricity.

There is no language in the fencing statute which excludes interurban railways from its provisions, nor is there anything in its provisions negativing the idea that they were intended to be included. The statute provides that the company shall be liable whenever any stock may be killed or crippled "by any train of cars, or engine, or cars upon such track." The statute uses the words "railroad" and "railway" indiscriminately, and makes no distinction between them.

We think the public has the same interest in avoiding accidents on interurban railways as on steam railroads; in fact, an accident on an interurban railway, resulting from a collision with live stock, may prove more harmful than one on a steam railroad produced by the same cause, for the reason that a train operated by steam is much heavier and can more easily and effectively resist the impact of such collision.

We are of the opinion, therefore, that both the trial court and the court of civil appeals were correct in holding that the railroad fencing statute applied to defendant, and the first assignment of error will be overruled.

It is next insisted that, even if it should be held that defendant is subject to the provisions of the fencing statute, it is excused from fencing its track at the point where the accident occurred. This is said to be true because the proof shows that the collision occurred immediately on the crossing that leads from the turnpike into Adams' gate on the opposite side of defendant's track, and that this crossing was of such a character that the defendant was relieved of the duty of inclosing it with a fence.

In the first place, the evidence is in dispute as to whether the collision occurred immediately on the crossing or just

south of it.  If the accident occurred a sufficient distance south of the crossing to make it practical to have erected and maintained cattle guards between the crossing and the the place of the accident, then defendant would be liable for its failure to have cattle guards, even though it was not required to inclose the crossing itself.

We think, however, that under the uncontroverted facts the crossing in question was not of such a character as to relieve defendant of the requirements of the fencing statute.  There is no dispute as to the character of the crossing in question.  Defendant relies on the holding of this court in *Railroad* v. *Thompson,* supra, wherein the court held that the railroad company was not liable for killing a horse on the ground that the collision occurred at the intersection of the railroad and private way leading to the residence of the owner of the horse, as the roadway in question in that case was of such character that the railroad would not be permitted to obstruct it by the erection of a fence thereon. The road under consideration in that case had been used by the plaintiff for twenty-five or thirty years as a way from his residence across the railroad track into a large inclosed woods, and  thence to a public  road leading to  a town, school, mill, church, and graveyard.  He owned the land on both sides of the railroad, and had no other open way of ingress and egress to and from his residence, which stood a short distance west of the crossing.  The court held that the failure of the company to fence its track at the crossing of such private road afforded no ground for the company's liability for injury to an animal growing out of a collision with one of its trains at such crossing, as the obstruction of such a road is forbidden and punishable by statute.

The road or private way under consideration in the instant case does not fall within the rule announced in *Railroad* v. *Thompson*, supra, but falls within the rule announced in *Greer* v. *Railroad*, 104 Tenn., 243, 56 S. W., 850, wherein it was held that railroad companies are not forbidden nor excused from fencing their tracks at intersections with private ways or crossings used by owners of farms in passing from one field to another, but that in closing or obstructing such a private way or crossing against the entrance of stock upon its track the railroad company must provide the free use of the same by the landowner, by the erection of gates, properly constructed bars, or other appropriate means, and the railroad company must keep these in proper repair, and use due diligence to keep them closed.

The uncontroverted proof shows that the private road or way in question was not the way of Mr. Adams to and from his residence, or to and from any school, church, or graveyard. It simply led to a grass lot or pasture, and was not such a way as the obstruction of which was prohibited by statute. All of the witnesses agree that it was practicable to fence the track at the point in question, and to maintain gates at said crossing. There was no proof to the contrary.

It is next insisted that the court of civil appeals should have reversed the judgment for the improper action of the trial judge in excluding the testimony of R. B. Vaughn, a witness for defendant, as to the value of the animal killed.

We do not think there was any error in the exclusion of this witness' testimony. He admitted that he had never raised pure-bred Jersey cattle. He admitted that he had not posted himself in such matters, and when asked about

the pedigree of the bull in question he expressly stated
that he could not tell anything about that, stating that he
was not familiar with pedigrees. He further stated that
he could not qualify as a witness who knew the value of
breeding and lines of breeding. He expressly stated that
he was not an expert along that line. Again, when asked
if he had ever undertaken to familiarize himself with the
value of pedigreed Jerseys and the strains of different fam-
ilies, he replied:

"No, sir; not in a general way I have not. I have owned
a few registered Jersey cows, and I have been at a few
registered Jersey sales, and I know they bring much better
prices, owing to the family; but as to being familiar, and
how to place a value on them, and knowing the high-price
families, I could not say I do.

"Q. And don't undertake to say?

"A. No, sir."

In view of these statements made by the witness, we do
not think that the trial judge committed error in exclud-
ing his testimony. His testimony was in the nature of
that of an expert, and the question of whether he had prop-
erly qualified as such was a matter which rested in the
sound discretion of the trial judge, and his action in ex-
cluding the testimony of the witness will not be reviewed,
in the absence of a showing that he abused his discretion.
*Roper* v. *Memphis Street Railway,* 136 Tenn., 29, 188 S.
W., 588; *Powers* v. *McKenzie,* 90 Tenn., 167, 16 S. W., 559;
*Bruce* v. *Beall,* 99 Tenn., 303, 41 S. W., 445.

It is next insisted that the court of civil appeals com-
mitted error in refusing to review the judgment for error
committed by the trial judge in his statement made in the

presence of the jury in excluding the testimony of the witness Vaughn, which is as follows:

"Gentlemen, I will say to you, if my ruling on this matter, that by the observations and surroundings I was limiting you to something you could not get, I would say, perhaps, my ruling would not be sound in every respect; but when there are all around Nashville many people thoroughly conversant with these things, I think it is better to have testimony from people who know these things."

We do not think there was any prejudicial error in this statement. We can see no ground for the insistence of counsel that this statement was equivalent to saying to the jury that they should not regard the testimony of Mr. Curtiss, a witness for defendant, or any other witness introduced by defendant on the question of value; nor do we think it was equivalent to saying to the jury that the defendant did not want to introduce witnesses who would show the real value of the animal, as insisted by counsel for defendant.   The effect of the statement of the trial judge was that there were others around Nashville who possessed expert knowledge of the lines and breeding of Jersey cattle, and who were competent to testify as to such matters.  We are wholly unable to see how or wherein defendant was prejudiced by this statement.

It is next said that the court of civil appeals erred in refusing to reverse the judgment on account of error committed by the trial judge in excluding the testimony of defendant's witness S. E. Brown to the effect that plaintiffs offered to sell him the animal in question about a year and a half before he was killed for the sum of $100.

This evidence was clearly incompetent, and could not be heard to establish the value of the bull at the time he

was killed.   Brown did not claim that he was familiar with the market value of the bull at the time he was killed. Defendant's counsel do not even undertake to show how or upon what theory this evidence was competent.

It is next insisted that the court of civil appeals erred in not reversing the judgment on account of error committed by the trial judge in refusing to charge the jury upon the subject of expert testimony as requested by the defendant, which request is as follows:

"Gentlemen of the jury, expert evidence has been admitted for your consideration, in order to help you to arrive at the value, or market price, of the animal killed.   If you should find that the defendant is liable in damages, I charge you to give the testimony of both non-expert and expert witnesses a careful and painstaking investigation, with the view to find out the truth and keep from being misled or confused by it, for, while expert testimony is sometimes the best way to reach the truth, yet it is largely a field of speculation, beset with pitfalls and uncertainties, and requires patient and intelligent investigation to reach the truth."

The insistence of defendant, that the refusal of the trial judge to give this special request in charge, is based upon the holding of this court in *Wilcox* v. *State,* 94 Tenn., 106, 28 S. W., 312.

The substance of what the court held in that case was that expert testimony is to be received with caution.   It is true that the charge of the trial court under review in that case, among other things said:

"While expert testimony is sometimes the only means, or the best way, to reach the truth, yet it is largely a field of speculation, beset with pitfalls and uncertainties, and re-

quires patient and intelligent investigation to reach the truth."

This court, in passing upon the statement of the judge, said:

"This is only the closing extract from a long and lucid charge as to the weight to be given to such testimony, both that of nonexpert and that of expert, and the whole is substantially in conformity to the rule laid down that expert testimony is to be received with caution"—citing *Persons* v. *State,* 90 Tenn., 291, 16 S. W., 726; *United States* v *Pendergast,* 32 Fed., 198; Rice on Evidence, vol. 2, p. 708.

In *Fisher* v. *Insurance Co.,* 124 Tenn., 150, 138 S. W., 316, Ann. Cas., 1912D, 1246, it was held that a charge instructing the jury that they must receive and consider expert testimony with great caution, that they must make a careful and painstaking investigation of all the facts, with a view of reaching the truth, and must not be misled or confused by expert testimony, because, while such testimony is sometimes the only means or the best way to reach the truth, yet it is largely a field of speculation, beset with pitfalls and uncertainties, and requires patient and intelligent investigation to reach the truth, was erroneous, as discriminating too strongly against such class of evidence in warning the jury that they "must not be misled or confused by expert testimony," and, also in charging, in respect of all of the expert testimony in the case, that it must be received with "great caution."

In that case the opinion contains the following language:

"This court, by the cases already cited, is thoroughly committed to the doctrine that such evidence must be received with caution, and that, where it is paid for, it must

be received with great caution; but further than this we have not gone. There is evinced in the case of *Atkins* v. *State* an inclination to bring our authorities as nearly as possible into line with the current of authority, without, in terms, modifying the prior cases. We do not think that any of these cases would justify the trial judge in warning the jury that they 'must not be misled or confused by expert testimony.' We think this is discriminating too heavily against that class of evidence, and that the trial judge committed error in this respect. We also think he committed error in charging, in respect of all of the expert testimony in this case, that it must be received with 'great caution.' "

It is next said that the verdict of the jury is excessive, and that the court of civil appeals erred in not so holding.

We do not think this contention is well taken. The bull in question was registered "Karnack's Noble Raleigh," No. 144927. He had an official recorded pedigree that extended back for six generations. The bull was kept by its owners for breeding purposes. The value of such a bull depends on his ability to produce daughters of great milk and butter capacity. The animal in question had developed this capacity. A number of witnesses testified that he was of a value much greater than that fixed by the jury. W. A. Griswold, who has had large experience in producing registered Jersey cattle, and is one of the directors of the American Jersey Cattle Club, and vice president of the Tennessee Jersey Cattle Club, testified that the value of the animal was from $3,000 to $5,000, and a number of other witnesses testified that his value was from $2,000 to $5,000. The testimony of only one witness, Mr. Curtiss, is at variance with these values, and he admitted that he did

not know the pedigree of the animal and did not undertake to keep posted on Jersey cattle. He testified that the value of the bull was $500 at the time he was killed.

Evidence as to pedigrees and records of registered animals are generally recognized as matters to be considered by a jury in determining their value. *Citizens' Rapid Transit Co.* v. *Dews,* 100 Tenn., 317, 45 S. W., 790, 40 L. R. A., 518, 66 Am. St. Rep., 754.

There is no error in the judgment of the court of civil appeals, and it is affirmed, with costs.