[No. 31260. Department Two.   May 13, 1950.]

HARRY COVEY, *Respondent*, v. WESTERN TANK LINES, INC., *Appellant*.[1]

[1]Reported in 218 P. (2d) 322.

*Skeel, McKelvy, Henke, Evenson & Uhlmann, W. R. Mc-Kelvy* and *Altha P. Curry,* for appellant.

*W. R. Cole* and *J. D. Thomas, Jr.,* for respondent.

HAMLEY, J.—This is an action in negligence to recover damages occasioned by the loss of five male mink.

Harry Covey owns and operates a mink ranch a short distance east of Cle Elum, Washington, and adjacent to state primary highway No. 10. On the afternoon of September 22, 1947, a truck with attached semitrailer, owned by Western Tank Lines, Inc., and operated by Bob Bohn, was proceeding west on this highway. As the truck was about to pass the mink ranch, a wheel came off the trailer, rolled across the highway, and struck one of the mink sheds. Two male mink were killed and three others escaped from the damaged shed and were never recovered. All five of these male mink were what is known as dihybrid mink, being the result of the breeding of Imperial Platinum mink and Aleutian Blue mink.

Covey thereafter brought this action against Western Tank Lines, Inc., Bob Bohn and Bohn's wife. Bohn and his wife were not served with process and the terms defendant and appellant, as used herein, will refer only to Western Tank Lines, Inc. Covey sought recovery for the loss of the five male mink, alleged in the complaint to be worth eight hundred dollars each, and for $125.25 alleged damage to the pens. In his complaint he also sought recovery for the following alleged damages:

"That if plaintiff had not lost the above described five male mink by reason of defendants' negligence, those five male mink would have been mated to twenty female mink of the same breeding, which plaintiff then and now owns, and that ninety-six young mink would have resulted from such mating, and that the value of those ninety-six mink that would have resulted from such breeding would have been $24,000.00 greater than the value of the ninety-six mink kits produced by the same female mink by reason of mating with male mink of other breeding."

The case was tried before a jury. Regarding the cause of the accident, the evidence disclosed that the wheel came off because the studs or bolts holding it sheared off at the place they enter the drum. The truck and trailer had left Seattle at midnight before the accident, bound for Sunnyside to deliver a load of petroleum. At Sunnyside, the tires and the lugs on the studs were checked. This inspection was done with a flashlight, but the wheel was not removed. One or two lugs were found loose and were tightened. The driver started from Sunnyside for Seattle about one-thirty p. m., and in three and one-half hours had gone some one hundred miles when the accident happened.

On the question of damages, counsel for plaintiff, in his opening statement, said that the value of each of the five male mink which had been lost would be nearer five hundred dollars than the eight hundred dollars alleged in the complaint. The uncontroverted evidence introduced by plaintiff showed that the fair market value of these five mink was between four and five hundred dollars each.

Relative to the damages claimed by reason of the alleged loss of mink progeny, considerable evidence was received, all of it over the objection of defendant. It was shown that in the 1948 breeding season, plaintiff's nineteen dihybrid female mink were mated with Imperial Platinum males, and resulted in ninety-six kittens. Had it not been for this accident, these females would have been mated with the five dihybrid males which were lost. Plaintiff's evidence tended to show that this mating would also have resulted in at least ninety-six kittens. Plaintiff then produced testimony and exhibits for the purpose of showing that the value of the ninety-six kittens which would have resulted from such mating would have been greatly in excess of the value of the kittens which were actually produced.

In this connection, expert witnesses testified as to the operation of the Mendelian law of averages in inheritance. Two charts were introduced as exhibits, one showing the number and type of mink actually produced in the 1948 season. The other chart showed the probable number and type of mink that would have been produced if the five dihybrid males had bred the nineteen dihybrid females. This second chart represented the operation of the Mendelian law in the breeding that would have occurred had the dihybrid males been available.

According to the evidence, the prime purpose of breeding dihybrid males to dihybrid females is to get Sapphires, a rare strain generally considered the finest and most valuable platinum mink yet produced. At the time of the trial there were some two hundred Sapphires in the United States among seven thousand breeders. In 1947 there were only three. The second chart referred to above shows that if five dihybrid males are bred to nineteen dihybrid females, there would be nine possible combinations in coloring of the offspring, one of which is a Sapphire. It was testified that, according to the Mendelian law, the breeding of dihybrids would show an average in mutations as shown on the chart, but that an "indefinite" number of such breedings is necessary before "it would fit exactly the theoretical ratio." One expert witness stated that the operation of this

law is subject to variation in any direction. He illustrated the working of the theory by an example of flipping four coins of two different denominations, and the average of head and tail combinations resulting.

This law of heredity was discovered by the Abbot Johann Gregor Mendel in 1865. However, his paper setting forth the results of prolonged experiments in crossing varieties of the garden pea was overlooked until 1900. It was testified that Mendel's principles of heredity are now generally accepted and have been definitely proved to apply to mink. Plaintiff's expert witness stated that, in spite of the Mendelian law, it was possible that, in a particular case, no Sapphires at all would result, or that there would be double the number called for by Mendel's law. Plaintiff produced other testimony tending to show the fair market value of mink which would have been produced, as compared to the market value of those actually produced. Defendant submitted testimony as to the failure of certain female mink to mate with particular males and as to the possibility of loss of the kittens after birth. Both parties submitted testimony as to sterility in male mink.

Plaintiff had a sixth dihybrid male which was not involved in the accident. This male was mated only once during the 1948 season, due to the fact that it was suffering from a bone boil. This mating was to a dihybrid female, and resulted in four kittens, none of them Sapphires. Plaintiff testified that after the accident he attempted to purchase dihybrid males and, in November, was offered two by a breeder at Portland, Oregon. Plaintiff testified that he was then pelting and could not go to Portland until about December 10th. By that time the two dihybrid males, which had been offered to him for five hundred dollars each, had been sold elsewhere at the same price.

The jury rendered a verdict for $8,125.25. Motions for judgment for defendant notwithstanding the verdict of the jury, and in the alternative for a new trial, were denied. On consent of plaintiff, however, the verdict was reduced $125.25, because no evidence as to the damage to the pens

had been introduced. Judgment was entered for eight thousand dollars. Defendant has appealed.

Most of the assignments of error relate to the reception of evidence regarding the loss of mink progeny during the 1948 breeding season; the giving of instructions under which the jury was permitted to consider this element of damage; and the refusal to give instructions which would have precluded the jury from considering such element of damage. Appellant contends, under these assignments, that the reception of this evidence and the giving of instructions which permitted the jury to consider such evidence, opened the way for the allowance of double damages. Appellant also contends that the evidence should have been excluded because of its speculative and conjectural character.

■ The measure of damages for the loss or destruction of personal property is ordinarily its market value, if it has a market value. 15 Am. Jur. 530, Damages, § 122; 25 C. J. S. 627, Damages, § 88. This measure of damages applies in the case of loss or destruction of animals. *Taylor v. Spokane Falls & Northern R. Co.*, 32 Wash. 450, 73 Pac. 499; 3 C. J. S. 1345, Animals, § 234. In determining the market value of animals, the particular qualities and capabilities of the animal may be taken into consideration. *Taylor v. Spokane Falls & Northern R. Co., supra; Union Traction Co. v. Anderson,* 146 Tenn. 476, 242 S. W. 876, 25 A. L. R. 1496.

■ Where an article has no market value, then the measure of damages is its actual or intrinsic value, or, in some cases, its value to the owner. *McCallister v. Sappingfield,* 72 Ore. 422, 144 Pac. 432; *Higgins v. Belson,* 66 Ida. 736, 168 P. (2d) 813; McCormick on Damages 170, § 45; 15 Am. Jur., *supra;* 25 C. J. S., *supra.*

■ The evidence introduced in this case, as summarized above, shows that dihybrid male mink have a definite market value, such value ranging from four to five hundred dollars. There is no question but that this market value takes into account, as it properly may, the special value of this particular kind of male mink for breeding purposes. This is demonstrated by the fact that dihybrid males, ac-

cording to the testimony, are worth only about twenty dollars each as pelts.

It follows that an allowance of this claimed market value compensates the owner for all use he would have made of the animals for breeding purposes. Anyone purchasing dihybrid males at that price in the fall of 1947, when this accident occurred, would have been entitled to their use for mating in the 1948 season. Anyone selling such animals in the fall of 1947 for their full market value as breeders, has no grievance because such animals were not available to him for breeding in 1948.

Where an animal has no market value, or where, as contended here, the owner is unable to obtain replacements, it may be that the special value of lost or destroyed animals may be proved by establishing the probable gain if such animals had been available to the owner for breeding purposes. The object of such a showing would not be to recover the market value of progeny, as appellant here sought to do. Rather, it would be to establish the recoverable value of the males who were negligently lost or destroyed. Accordingly, allowance of value on this basis is in substitution for the allowance of market value. Allowance on both bases would not only give effect to inconsistent theories regarding the owner's loss, but would permit the recovery of double damages.

No similar case, where recovery has been sought not only for the market value of the animals as breeders, but also for the value of anticipated progeny as yet unbred, has been called to our attention. But where, due to the negligent injury of animals which had been bred, they were caused to abort their young, it has been held that the allowance of the value which the young would have had at birth, in addition to the depreciation in the market value of the mother animals, would constitute an award of double damages. *Texas Pipe Line Co. v. Sheffield*, 99 S. W. (2d) (Tex. Civ. App.) 684. In this case, it appeared that certain cattle drank oil which was negligently permitted to escape onto pasture land. Some of the cattle died, some lost flesh, and some aborted their calves. With respect to the latter,

the jury found that the market value of the cows had been decreased five hundred dollars and that the aborted calves would have been worth five hundred ten dollars at the date of their birth. Recovery of both items was permitted by the trial court. In holding that this was error, the appellate court said:

"To allow the difference in the market value of the cows before and after the injury and also the value that the calves would have had if they had been born alive would be allowing double damages."

See, also, *Moorman Mfg. Co. v. Barker,* 110 Ind. App. 648, 40 N. E. (2d) 348.

Respondent places great reliance upon our decision in *Hamilton v. King County,* 195 Wash. 84, 79 P. (2d) 697. In that case, a mink farmer sought damages for the loss sustained due to the noise and disturbance caused by King county in digging a ditch close to the mink pens during the whelping season. The trial court found that, of sixty-eight female mink which had been mated, one raised her kittens, four whelped four kittens each but then destroyed them due to the disturbance, and the remaining sixty-three females aborted their young. Examination of the findings of fact in that case discloses that the trial court's judgment of $1,580 was based upon an allowance of twenty dollars each, as the pelt value of the sixteen kittens which had been destroyed by their mothers, and twenty dollars each, as the difference in value, before and after the disturbance, of the sixty-three females which had aborted their young. On appeal, we sustained the judgment, except that the amount was ordered reduced to $1,340, for the reason that the evidence did not support the finding that sixteen kittens were whelped, but that all sixty-seven females should be considered as having aborted their young.

The *Hamilton* decision has no bearing upon the question of double damages now under consideration. In that case the plaintiff did not seek damages for the value of unborn kittens (much less unbred kittens) in *addition* to the difference in the value of the females before and after the abortions. Neither the trial court nor this court allowed re-

covery for the value of unborn mink. The loss of progeny was taken into consideration only in calculating the decreased market value of the mother mink before and after the wrongful intrusion.

Respondent cites several cases as authority for the proposition that recovery may be had for the increase of animals in cases where the increase was proved by opinion evidence only. Among these are *Arkansas Valley Land & Cattle Co. v. Mann,* 130 U. S. 69, 32 L. Ed. 854, 9 S. Ct. 458; *Schrandt v. Young,* 2 Herdman (Neb.) 546, 89 N. W. 607; *Mattern v. McCarty,* 73 Neb. 228, 102 N. W. 468. These decisions may be pertinent in considering whether the evidence as to the number, quality and value of prospective mink was too conjectural and speculative. But in none of these cases was recovery sought for the value of animals as breeders, in addition to the value of actual or prospective young. Hence, the cases cited by respondent are not helpful on the question of double damages.

We are of the view that, having claimed the market value of the five dihybrid male mink as breeders, respondent's additional claim for the loss due to the inferior quality of the mink produced in 1948 was, in effect, a claim for double damages. The evidence relating to this second claim should not have been received, and the instructions which permitted the jury to consider such claim were erroneously given. Appellant's instructions Nos. 11 and 13, which would have permitted the jury to consider the breeding quality of these five males in fixing the value recoverable for their loss or destruction, but would have precluded the allowance of separate damages for the loss of use of such males, or the loss of anticipated profits, should have been given.

Our disposition of the issues discussed above makes it unnecessary for us to consider whether respondent's evidence as to the loss of mink progeny was too conjectural and speculative to be received or considered. However, since the case must be returned for a new trial, it is necessary to discuss appellant's assignments of error regarding another instruction which was given.

The trial court gave the following instruction embodying the doctrine of *res ipsa loquitur*:

"You are instructed that the burden of proof is upon the plaintiff to establish all of the controverted allegations of his complaint by a fair preponderance of the evidence. If you find from a preponderance of the evidence that the release of the wheel from the defendant's truck in the manner in which it was released was such as in the ordinary course of events would not happen if those who had the duty of keeping such truck in repair used such reasonable and ordinary care, you are entitled to presume a want of care on the part of the defendant trucking company through its agents and employees in the absence of explanations by the defendant trucking company."

Appellant does not contend that *res ipsa loquitur* may not be appropriately applied to a factual situation such as this, where a wheel becomes disengaged from a moving vehicle. See *Graaf v. Vulcan Iron Works,* 59 Wash. 325, 109 Pac. 1016, and *D'Amico v. Conguista,* 24 Wn. (2d) 674, 167 P. (2d) 157. Appellant's specific contention is that no instruction on *res ipsa loquitur* should have been given, for the reason that the cause of the accident was known and the fault, if any, was negligence in inspection and replacement.

■■ The doctrine of *res ipsa loquitur* is a rule of evidence which, when applied in a proper case, warrants the court or jury in inferring negligence, thereby casting upon the defendant the duty to come forward with an exculpatory explanation, rebutting or otherwise overcoming the inference. *Morner v. Union Pac. R. Co.,* 31 Wn. (2d) 282, 196 P. (2d) 744. The inference which the doctrine permits is grounded upon the fact that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to the defendant but inaccessible to the injured person. *Lynch v. Ninemire Packing Co.,* 63 Wash. 423, 115 Pac. 838, L. R. A. 1917E, 178; 38 Am. Jur. 995, Negligence, § 299. Accordingly, the doctrine has no application where there is direct evidence as to the precise cause of the injury and all the attending facts and circumstances appear. 38 Am. Jur., *supra.*

■ The problem has frequently arisen whether, in a particular case, the pleading and proof as to particular acts of negligence preclude the application of the doctrine of *res ipsa loquitur* under the principle stated above. We have held that, even though a party should base his action upon the doctrine of *res ipsa loquitur*, he may plead and prove specific acts of negligence on the part of defendant and may rely upon the presumption of negligence and, also, upon his proof of specific acts of negligence. *Case v. Peterson,* 17 Wn. (2d) 523, 136 P. (2d) 192; *Mahlum v. Seattle School Dist. No. 1,* 21 Wn. (2d) 89, 149 P. (2d) 918. However, if the evidence submitted by either or both parties is so completely explanatory of how the accident occurred that no inference is left that the accident may have happened in any other way, there is nothing left upon which the doctrine need or can operate. *Anderson v. Harrison,* 4 Wn. (2d) 265, 103 P. (2d) 320; *Morner v. Union Pac. R. Co., supra.*

■ Appellant contends that this is the case here. We think not. Appellant's explanation of the accident was that the ten studs or bolts holding the wheel had sheared off due to crystallization which could not have been discovered although adequate inspection was made. It is not disputed that the studs or bolts sheared off. But the evidence was in conflict, and left a distinct uncertainty, as to why this happened, and appellant's responsibility therefor. The testimony left a doubt as to whether the shearing off of these studs was due to loose lugs, wear on the studs, crystallization of the studs, or a combination of all three. There was also uncertainty in the testimony as to what causes lugs to loosen, and what causes studs to crystallize. In view of this, it could not be said that the evidence is so completely explanatory of how the accident occurred that an instruction invoking the doctrine of *res ipsa loquitur* was out of place in this case.

■ With respect to *res ipsa loquitur,* appellant also contends that, if an instruction embodying that doctrine is proper in this case, the particular instruction given is defective because it did not tell the jury that they must weigh

the inference in the light of appellant's possible explanation. The only reference made in this instruction, quoted above, to the necessity of the jury considering any explanation afforded by appellant is the last ten words of the instruction, reading ". . . in the absence of explanations by the defendant trucking company."

The application of *res ipsa loquitur* does not shift the burden of proof. Its only function is to warrant an inference as to negligence which operates to cast upon the defendant the duty of going forward with the evidence at the proper time, by furnishing an explanation of how the accident happened, and showing that it did not occur by reason of lack of due care on his part. *Hardman v. Younkers,* 15 Wn. (2d) 483, 131 P. (2d) 177, 151 A. L. R. 868. In the *Hardman* case we quoted with approval, citing several other decisions in support thereof, the following statement of the rule as set forth in *Briglio v. Holt & Jeffery,* 85 Wash. 155, 147 Pac. 877:

" 'The proper instructions as to the application of the presumption [arising under the doctrine of *res ipsa loquitur*] would be thus: The jury should be instructed that the burden of proof is upon the plaintiff to establish all the controverted allegations of his complaint by a fair preponderance of the evidence, and defining preponderance of the evidence; that when a situation is shown which necessarily infers negligence on the part of defendant or *res ipsa loquitur,* the burden then devolves upon defendant to furnish an explanation or rebuttal of that presumption of negligence, by producing evidence of his due care and proper precaution, under the circumstances and conditions necessarily within defendant's exclusive control. If then, after considering such explanation, on the whole case and on all the issues as to negligence, injury and damages, the evidence still preponderates in favor of the plaintiff, plaintiff is entitled to recover; otherwise not.' " (p. 493.)

We believe that, upon the new trial in this case, the instruction on *res ipsa loquitur* ought to be reframed to comport more fully with the rule as quoted above. We have in mind particularly the latter portion of the rule relating to the defendant's duty to provide an explanation, and the consideration thereof by the jury. In expressing this opin-

ion, we do not intend to hold that the giving of the instruction in the form actually used necessarily constituted reversible error in view of the other instructions given.

The judgment is reversed, with instructions to grant appellant a new trial.

ROBINSON and MALLERY, JJ., concur.

SIMPSON, C. J., dissents.

HILL, J. (concurring)—I am in accord with the majority on the proposition that the wrong measure of damages was applied; I am also in accord that this case warrants the application of the doctrine of *res ipsa loquitur*, and that the instruction thereon was not adequate. I have expressed my views at length on the effect of the application of that doctrine in my dissent in *Nopson v. Seattle*, 33 Wn. (2d) 772, 207 P. (2d) 674. I there pointed out the propositions which should be kept in mind to make the majority's quotation from *Briglio v. Holt & Jeffery*, 85 Wash. 155, 147 Pac. 877, the basis of a proper instruction. I adhere to the views expressed in that dissent.